<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **VICTOR HUGO LEIVA,**<br><br>*Petitioner*,<br>v.<br><br>**SECRETARY OF DEPARTMENT OF HOMELAND SECURITY, et al.,**<br><br>*Respondents.* | **Civil Action No. 11-629**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**I.   INTRODUCTION**

Petitioner Victor Hugo Leiva ("Mr. Leiva") filed this Petition for Review of the Administrative Denial of Application for Naturalization pursuant to 8 U.S.C. § 1421(c).  Mr. Leiva is a 58-year-old man who has been a Lawful Permanent Resident of the United States since June 3, 1996.  On June 29, 2009, Mr. Leiva filed an Application for Naturalization, which was denied on April 19, 2010.  Thereafter, Mr. Leiva filed this appeal.

From August 9, 2016 to August 10, 2016, I presided over a non-jury trial in which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and the evidence.

Below, I make the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) based on the competent evidence presented at trial:

II.     FINDINGS OF FACT[1]

A.  Immigration to the United States

1.  Victor Leiva was born in Guatemala on March 8, 1958.  Final Pretrial Order ("FPTO") at 6, Dkt. No. 58.   He has a sixth grade education.  Trial Transcript ("Tr.") 159:2-3.

2.  In Guatemala, Mr. Leiva was in a ten-year relationship with a woman named Rosaura Torres, with whom he had two children.  Tr. 156:23-157:20.  Mr. Leiva's two adult children from that relationship now reside in the United States.  Tr. 158:02-18.

3.  On October 10, 1992, Mr. Leiva entered the United States without inspection.  FPTO at 2; Tr. 153:20-22.  He traveled through Tijuana, Los Angeles, and San Diego, ultimately ending up in New Jersey.  Tr. 153:15-19.

4.  Once in the United States, Mr. Leiva was initially self-employed as a roofer.  Tr. 188:16-17.

5.  In 1997, Mr. Leiva began working as a welder and aluminum cutter at Christiansen Manufacturing, a small family-owned welding and farming business in Pennington, New Jersey.  Tr. 18:14-16, 35:12-36:1, 153:8-14.  He has been continuously employed there for almost 20 years.  Tr. 153:8-14.  His duties have expanded over the years to include overseeing the family farm.  Tr. 19:9-20.

6.  He pays taxes on income received from Christiansen Manufacturing.  Tr. 26:5-10.

B.  Marriage to Jacqueline Davis and Permanent Residence Status

7.  After his arrival in the United States, Mr. Leiva began a relationship with Jacqueline Davis, a United States citizen.  Tr. 185:09-186:07.

---

[1] These facts incorporate the factual stipulations of the parties in the Final Pretrial Order and those facts agreed to at trial.

8.  Mr. Leiva married Ms. Davis on May 23, 1995.  Tr. 186:09-11; FPTO at 6.

9.  The couple has two children together: a son Alan and a daughter Gloria.  Tr. 186:12-21.

10. On June 28, 1995, Ms. Davis submitted to Immigration Naturalization Services ("INS") a Form I-130 Petition for Alien Relative, which a U.S. citizen may submit on behalf of a spouse who wishes to become a citizen.  FPTO at 6; Gov't Ex. 7, Form I-130.  The form indicated that Mr. Leiva was not previously married.  FPTO at 6; Gov't Ex. 7.

11. On January 9, 1996, Mr. Leiva submitted a Form I-485, Application to Register Permanent Residence or Adjust Status, in which he claimed eligibility to become a lawful permanent resident based on his marriage to Ms. Davis.  FPTO at 6; Gov't Ex. 6, Form I-485.

12. Mr. Leiva and Ms. Davis eventually divorced, with Mr. Leiva gaining sole custody of their children.  Tr. 187:03-11.

13. On May 13, 1999, the INS granted Mr. Leiva's adjustment application, providing Mr. Leiva the status of lawful permanent resident.  FPTO at 7; Gov't Ex. 8, Form I-181.

## C.  Arrest and Plea

14. On July 5, 2000, Mr. Leiva was arrested based on a complaint that neighborhood children viewed a pornographic video in his house the day before.  See Tr. 95:13-17, 128:22-129:3; Ct. Ex. 3, Police Report at 4-5.

15. A subsequent search of his house only uncovered one adult video and magazine.  Tr. 132:6-19.

16. On July 11, 2001, the Mercer County Prosecutor indicted Mr. Leiva in the Superior Court of Mercer County, New Jersey, on a multiple count indictment.  Gov't Ex. 10, Indictment.[2]

---

[2] "[A] federal court may take judicial notice of the proceedings in other courts of record."  Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980).

17. Because Mr. Leiva lost his housing after he was arrested, the Christiansen family invited him to live with them, which he did for over a year.  Tr. 21:17-25.  Mrs. Christiansen, who had four young children at the time, expressed no concern over having Mr. Leiva live with her during the pendency of the charges.  Tr. 22:21-23:24.

18. On October 17, 2003, more than three years after the incident occurred, he pled guilty to one count of Endangering the Welfare of a Child, N.J.S.A. § 2C:24-4, before the Superior Court of New Jersey.  Gov't Ex. 11, Transcript of Plea Hearing dated October 17, 2013 ("Plea Tr.").

19. During the plea colloquy, the state court judge questioned Mr. Leiva about the factual circumstances that gave rise to the charge.  See Plea Tr. 15:11-22:11.

20. Mr. Leiva testified that he was alone in his house watching an adult movie when a group of children entered without permission.  Plea. Tr. 15:22-12:6, 20:18-23.

21. The state court judge noted that such accidental viewing would not constitute an offense, but accepted Mr. Leiva's plea based on his testimony that the incident lasted "for about five minutes."  Plea Tr. 15:25-16:2, 22:1-11.

22. The judge sentenced Mr. Leiva to probation for a term of three years in light of several mitigating factors including that he had no other criminal record; completed an evaluation report, which indicated that he was not a repetitive or compulsive offender; appeared emotional during the hearing; maintained a job; and was current on all child support payments (he lost custody of his children after the arrest).  Gov't Ex. 13, Transcript of Sentencing dated March 26, 2004 ("Sent. Tr.") 7:14-9:15.

23. The court also required Mr. Leiva to comply with Megan's Law.  Sent. Tr. 9:19-10-4.

24. On April 5, 2004, the judge signed Mr. Leiva's Judgment of Conviction detailing the conditions of his probation. This Judgment of Conviction, and a second one that issued later that month, included a Megan's Law requirement of community supervision for life. <u>See</u> Gov't Ex. 14, Judgments of Conviction at 1-4.[3] Mr. Leiva testified that, as part of his Megan's Law compliance, he provided his address to the probation officer and underwent DNA testing.  Tr. 200:22-201:1, 240:12-21.

25. In May 2005, a third Judgment of Conviction was entered, which omitted Megan's Law and did not check the box for lifetime community supervision.  <u>See</u> Judgments of Conviction at 5.

26. Mr. Leiva completed his parole without incident in 2007.  <u>See</u> Tr. 201:11-13.

**D. Naturalization Proceedings: Application and Denial**

27. In June 2009, Mr. Leiva began his naturalization process by submitting an N-400 Application for Naturalization.  FPTO at 7.

28. In his application, he indicated that he has been a lawful permanent resident for at least five years, that he has been married one time, and that he has never "given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation,  exclusion, or removal."  <u>Id.</u>

29. He also disclosed the arrest, conviction, and parole sentence.  Gov't Ex. 16 ("N-400 Application") at 8.

---

[3] The Court takes judicial notice of Mr. Leiva's Judgments of Conviction.  <u>See</u> <u>United States v. Lopez-Solis</u>, 447 F.3d 1201, 1210 (9th Cir. 2006).

30. On September 15, 2009, United States Citizenship and Immigration Services ("USCIS") interviewed Mr. Leiva as part of its processing of his naturalization application.  FPTO at 7.

31. On that date, a USCIS Adjudication Officer ("Officer One") administered a civics and history exam, English reading test, and English writing test.  Tr. 65:19-21, 66:6-67:6.

32. Mr. Leiva passed both the civics and history test and the English reading test.  Tr. 66:6-8, 75:18-13.

33. The English writing test consisted of three sentences that were read aloud in English to Mr. Leiva.  Gov't Ex. 17, English Writing Test.  After each one, Mr. Leiva was required to write the sentence down in English.  Id.  The applicant must get one of the three correct in order to pass the examination.  Id.

34. Officer One marked Plaintiff's first two answers as incorrect.  Id.

35. The third sentence required Mr. Leiva to write "Flag Day is in June."  Mr. Leiva wrote "flag Day is in Junio."  Id.  Officer One also marked this answer as incorrect.  Id.

36. Officer One found that Mr. Leiva failed the English writing test.  Tr. 59:11, 65:11-13.

37. Mr. Leiva was not given a second opportunity to take the English writing exam.  Tr. 59:12-24, 104:25-105:2.

38. On September 16, 2009, USCIS issued a Request for Evidence to Mr. Leiva's attorney, which requested the police report of his July 5, 2000 arrest, a copy of the indictment resulting from the arrest, a copy of the pre-sentencing report, and a copy of the October 17, 2003 plea agreement.  FPTO at 7; Tr. 80:18-23.

39. Mr. Leiva's attorney submitted the police report and sentencing transcript but not the plea transcript.  FPTO at 7; Tr. 80:18-23.

40. As such, on April 19, 2010, USCIS denied Mr. Leiva's application for failure to prosecute because his attorney did not submit all requested documents.  FPTO at 8; Tr. 80:18-23.

41. In May 2010, Mr. Leiva filed a Form N-336 Request for Hearing on a Decision in Naturalization Proceedings.  FPTO at 8.

42. In November 2010, after another USCIS officer ("Officer Two") interviewed Mr. Leiva, USCIS affirmed its denial of his application, citing lack of remorse and lessons learned. Id.

43. In February 2011, Mr. Leiva appealed the denial to this Court.

**E. De Novo Court Hearing**

44. At Mr. Leiva's de novo hearing before the Court, the Government asserted three new reasons why Mr. Leiva could not satisfy his naturalization burden, abandoning their prior bases.  First, they asserted that he could not prove lawful admission.  They contended that his marriage to Ms. Davis, which gave him lawful status, was bigamous and thus invalid because he was married to  Rosaura Torres.  Second, they asserted that he could not prove that he was a person of good moral character.  They contended that Mr. Leiva testified falsely about the number of times he was married, his reason for leaving Guatemala, and his arrest and Megan's Law compliance.  Third, they asserted that Mr. Leiva failed to prove proficiency in the English language.

45. At trial, Mr. Leiva testified that he was in a long-term relationship with Ms. Torres for 10 years, and that they had two children together.  Tr. 156:25-157:02.  But Mr. Leiva testified he was never married to Ms. Torres, either civilly or in a religious ceremony, and that he had never told anyone otherwise.  Tr. 157:03-157:13.  The Court finds that Mr. Leiva's testimony about his relationship with Ms. Torres credible and not contradicted.

46. The Government attempted to offer three documents into evidence to cast doubt on the validity of Mr. Leiva's marriage to Ms. Davis.  All the documents purport to be from an asylum application in 1993: (1) an application for asylum, (2) a Form G-325A Biographical Information, and (3) a Form I-765 Application for Employment Authorization.  The documents are Government Exhibits 1, 2, and 3, respectively.

47. However, Mr. Leiva could not confirm at trial that the signatures on the documents were his or that all of the information was correct.  Tr. 210:03-21, 218:18-219:09, 222:01-224:20, 226:02-10.  The documents were completed in English, but it is undisputed that Mr. Leiva could not read or write in English in 1993, when the forms were completed.  He further testified that he did not recall ever being granted asylum in the United States.  Tr. 209:11-17.  The Court finds Mr. Leiva's testimony on this point credible.

48. The Government provided no other evidence to authenticate Exhibits 1, 2, or 3.  The Government called no witnesses with knowledge of the 1993 asylum petition or knowledge of the alleged bigamous marriage.

49. Mr. Leiva also testified about his reasons for leaving Guatemala.

50. He testified that, when he left Guatemala in the early 1990s, the country was engulfed in civil war, which made work difficult to find.  Tr. 154:16-17.  He further testified that three of his six family members died during the war, and that he faced particular danger because of his military service.  Tr. 154:11-155:19.  He explained that he was singled out by guerilla forces because he fought for the government.  Tr. 155:20-156:1.  He then testified that he immigrated to the United States because it was safer and he could find work here.  Tr. 156:9-22.

51. Based on the Court's observation of Mr. Leiva during his discussion of these events, including the strong emotional impact it has on him and the coherence of the events he described, the Court finds credible his testimony about his decision to leave Guatemala because of political strife and his choice to come to the United States to find work.

52. The Court further finds that this testimony is not inconsistent with his deposition testimony, where he responded that he came to the United States because he was "[l]ooking for a good job." Tr. at 232:23-233:12.

53. Mr. Leiva testified about his 2000 arrest and Megan's Law compliance.

54. Mr. Leiva admitted that he was home alone watching the adult movie when a group of neighborhood children entered his house without permission. Tr. 193:2-22.

55. Mr. Leiva recalled the incident lasting "five, six, or seven seconds," Tr. 193:5-194:7, instead of the five minutes mentioned in the plea colloquy.

56. Mr. Leiva also testified that he recalled discussing Megan's Law during his plea colloquy, but that his "attorney said that there was no need for that for me." Tr. 200:11-24. He testified that he satisfied the requirements as described in the plea colloquy and sentencing. Tr. 240:12-15; see Tr. 240:17-21, 200:22-201:1. The Court finds Mr. Leiva's testimony on this point credible, as well.

57. The Government offered no witnesses or evidence about Mr. Leiva's failure to comply with Megan's Law.

58. Mr. Leiva also presented two character witnesses to address the arrest and other aspects of his life.

59. He first offered Joy Ann Christiansen, his current and longtime employer, who testified that she let him move into her house with her husband and four young children after his

arrest.  Tr. 21:17-23.  She testified that she had come to consider him a friend and an honest person, and let him stay in the house for roughly a year.  Tr. 22:16-25, 19:1-8, 21:9-15. She frequently left the children alone with him and never had any issues, and testified that her children "adore him."  Tr. 23:8-24.

60. Tyler Christiansen, Ms. Christiansen's adult son, also testified that he was often alone with Mr. Leiva without incident when he was a child, and that there was never any "unusual or distressing" behavior.  Tr. 39:11-22.  When asked whether any issues arose at any time, he responded, "[a]bsolutely not, no."  Tr. 17-19.

61. Joy and Tyler Christiansen further testified that Mr. Leiva was of sound moral character, and unreservedly supported his application for citizenship.  Tr. 30:7-11, 39:19-24.

62. The Court also heard testimony about Mr. Leiva's English examination.

63. Officer One, who conducted Mr. Leiva's English writing exam, had been previously convicted of a crime and demoted for discharging his service weapon in the air in Point Pleasant, New Jersey while intoxicated.  Tr. 44:9-22, 46:1-3.  After that incident, he was hired by USCIS to his current position, where his responsibilities include determining whether immigration applicants have sufficient moral character and language skills (among other things) to become permanent residents.  See Tr. 47:19-25, 48:1-6, 77:7-11.

64. As to the English writing examination, Officer One stated that there are no binding procedures to determine whether an applicant passes or fails the written examination, and that such decisions "could fluctuate from examiner to examiner."  Tr. 68:9-15, 68:20-69:10, 72:25-73:4.

65. He further explained that grading is very subjective:  It is similar to having "the tough teacher or the easy teacher" in high school, and he is "pretty strict." Tr. 68:20-69:7, 72:22-73:4.

66. As to Mr. Leiva's exam, Officer One explained that Mr. Leiva's response to the third sentence was incorrect because "Junio is not an English word," Tr. 71:12-13, and because it "doesn't sound like June," Tr. 72:14.  But he also testified that he would pass an applicant that wrote "Joon," because it is "phonetically the same as June," even though it is spelled incorrectly.  Tr. 72:1-18.

67. He admitted that he was not aware of any regulations or guidance that explain how he should have evaluated this answer, see Tr. 68:9-15, even though such guidelines do exist, see Section IV.C, infra.

68. The Court finds that Officer One's grading of the written examination was arbitrary.

69. Officer Two, who conducted Mr. Leiva's appeal, testified that she sometimes functions as an initial examining officer and sometimes as an appeals officer.  Tr. 85:18-86:8.

70. When she serves in an appellate role, as she did with Mr. Leiva, she still collaborates with the initial reviewing officer. For example, she testified that she discussed Mr. Leiva's application with Officer One, "because generally in appeal cases we do often ask the original adjudicator about the case."  Tr. 118:6-8.

71. Officer Two's appellate record consists largely of red check marks on the same form where Officer One put black check marks.  See Tr. 89:4-5, 97:1-98:10.  She can identify who wrote the check mark because "everyone has a different style of writing."  Tr. 90:17-20, 94:23-97:4.  She testified, however, that other than her familiarity, there is no way to determine which officer made each mark on the naturalization form. Tr. 97:8-98:18.

III.   **LEGAL STANDARDS**

**A. Judicial Review of Naturalization Denials**

72. The Court reviews naturalization denials de novo, and is required to make its own findings of fact and conclusions of law. 8 U.S.C. § 1421(c). The Court's review is therefore not limited to any administrative record, but on the facts established in and found by this Court. Saliba v. Att'y Gen. of United States, 828 F.3d 182, 189 (3d Cir. 2016) (internal citations omitted).

73. An applicant for naturalization has the burden of proving "by a preponderance of the evidence that he or she meets all of the requirements for naturalization." 8 C.F.R. § 316.2(b); see also Bagot v. Ashcroft, 398 F.3d 252, 256-57 (3d Cir. 2005). "[S]trict compliance with all the congressionally imposed prerequisites to" citizenship is required. Fedorenko v. United States, 449 U.S. 490, 506 (1981); United States v. Szehinskyj, 277 F.3d 331, 334 (3d Cir. 2002). "The burden is on the alien applicant to show his eligibility for citizenship in every respect." INS v. Pangilinan, 486 U.S. 875, 886 (1988) (internal citation omitted). Thus, "when doubts exist concerning a grant of [citizenship], generally at least, they should be resolved in favor of the United States and against the claimant." United States v. Manzi, 276 U.S. 463, 467 (1928) (citation omitted).

74. Among the requirements to be eligible for naturalization are (1) lawful admission for permanent residence, (2) good moral character, and (3) proficiency in the English language. See 8 U.S.C. §§ 1423(a)(1), 1427(a) & (e), 1429.

**B. Lawful Admission**

75. An applicant for naturalization must establish that he was "lawfully admitted for permanent residence" to the United States. 8 U.S.C. § 1427(a). Lawful admission requires

compliance with the legal requirements for admission.  See Gallimore v. Attorney General, 619 F.3d 216, 224 (3d Cir. 2010); Kyong Ho Shin v. Holder, 607 F.3d 1213, 1217 (9th Cir. 2010) (grants of lawful permanent resident status that are not in substantive compliance with immigration laws are void).

76. Lawful permanent resident status that is based on an individual's marriage to a United States citizen requires that the marriage was "entered into in good faith and in accordance with the laws of the place where the marriage took place."  8 U.S.C. § 1255(e)(3).

77. Lawful marriage in New Jersey requires both spouses to be unmarried at the time.  A married person is guilty of bigamy if "he contracts or purports to contract another marriage."  N.J.S.A. § 2C:24-1.

## C.  Good Moral Character

78. Another requirement for naturalization is that an applicant possesses "good moral character."  8 U.S.C. § 1427(a); 8 C.F.R. §§ 316.2(a)(7), 316.10.  The Immigration and Nationality Act ("INA") lists a number of circumstances that indicate an applicant's lack of moral character, including giving false testimony for the purpose of obtaining an immigration benefit.  See 8 U.S.C. § 1101(f)(6).

79. The testimony must be an "oral statement made under oath."  Kungys v. United States, 485 U.S. 759, 780 (1988).

80. The testimony does not have to be material, but it must be made with the subjective intent to obtain the immigration benefit.  Id.; 8 C.F.R. § 316.10(b)(vi).   "Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, [are] not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character."  Kungys, 485 U.S. at 780 (internal citations omitted).

81. The INA also permits a finding that the applicant has bad moral character for any other reason outside of the listed examples. 8 U.S.C. § 1101(f) ("The fact that any person is not within the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character.").

## D. Literacy Requirement

82. To be naturalized as a citizen, an applicant must demonstrate proficiency in the English language. The relevant statute provides:

> (a) No person except as otherwise provided in this subchapter shall hereafter be naturalized as a citizen of the United States upon his own application who cannot demonstrate—
>> (1) an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language: *Provided*, That the requirements of this paragraph relating to ability to read and write shall be met if the applicant can read or write simple words and phrases to the end that a reasonable test of his literacy shall be made and that no extraordinary or unreasonable condition shall be imposed upon the applicant . . . .

8 U.S.C. § 1423; see also 8 C.F.R. § 312.1(a).

## IV.   CONCLUSIONS OF LAW

## A. Lawful Admission

83. The Government asserts that Mr. Leiva was not lawfully admitted for permanent residence because his marriage to Jacqueline Davis was invalid on the basis that he was also married to Rosaura Torres at the time.

84. The Court finds that Mr. Leiva has met his burden of establishing the validity of his marriage to Ms. Davis, and his testimony on this point was credible.

   a.   While Mr. Leiva lived with Ms. Torres in Guatemala, he credibly testified that he was never married to her. Tr. 218:14.

14

b.  His testimony is corroborated by the Form I-130, submitted by Ms. Davis, which indicated that Mr. Leiva was never married before.  Gov't Ex. 7.

c.  There is no other competent evidence admitted at trial that suggests Mr. Leiva was previously married.

85.  The Government exclusively relied on Exhibits 1, 2, and 3, the asylum application documents (see paragraph 44 above), to challenge the marriage, but they have not offered any basis to admit these documents.[4]  The Court therefore declines to admit them since they have not been authenticated.

86.  The Court rejects the Government's contention that Mr. Leiva stipulated to the admission of these exhibits in the Final Pretrial Order.  There is no such stipulation.

a.  The Final Pretrial Order establishes that Mr. Leiva and the Government dispute the admissibility of the Government's Exhibits 1, 2, and 3.  Mr. Leiva did not stipulate to the admission of the exhibits, or the information contained therein.  To the contrary, these Exhibits appeared in the list of "Contested Facts" agreed upon in the Final Pre-Trial Order.  See FPTO at 11.

87.  Nor are the exhibits admissible as ancient documents or public records.

a.  None of the exhibits are admissible as ancient documents because the Government has not established that the documents were located "in a place where, if authentic, [they] would likely be."  Fed. R. Evid. 901(b)(8)(A); see also 31 Fed. Prac. & Proc. Evid. § 7113 (1st ed.).  The Government proffered no witness or evidence on this issue.

---

[4] Even if they were admissible, the Court would attach little weight to them since they were not completed by Mr. Leiva, who could not read or write English at the time they were completed.

    b. Exhibits 1 and 2 are not admissible as public records because there is no evidence that the documents were "recorded or filed in a public office as authorized by law." Fed. R. Evid. 901(b)(7)(A). The Government has not shown that these documents were in fact kept in the custody of "the public office where items of this nature are kept." 31 Fed. Prac. & Proc. Evid. § 7112 (1st ed.). The Government proffered no witness or evidence on this issue, either.

88. Lastly, the Government was not prejudiced by the Court allowing Mr. Leiva to testify out of order. The Government should have anticipated the need to have their documents authenticated by their own witnesses, particularly since the documents were not in Mr. Leiva's handwriting and he could not write or speak English at that time.[5] As such, the Government's claim of prejudice has no merit.[6]

89. The Court next holds that Mr. Leiva has met his burden of establishing good moral character during the statutorily prescribed period:

    a. He has demonstrated that he has been gainfully employed, pays his taxes, has no criminal record during the prescribed period, cares for his children, and has the overwhelming support of his employer, who has accepted him as a virtual family member.

---

[5] Moreover, after Mr. Leiva's testimony, the Court raised authentication issues for Exhibits 1, 2, and 3. See Tr. 254:12-256:10. The Court noted that Mr. Leiva's testimony would not suffice to authenticate the documents. Id. In response, the Government did not proffer a basis for admissibility or call a rebuttal witness, and asked the Court to reserve on any authentication issues. Tr. 256:11-12

[6] Mr. Leiva also offers Petitioner's Exhibits 1 and 2 for admission. Both exhibits purport to be documents created in Guatemala that are relevant to his marriage status. These documents are not admissible, either. They are not self-authenticating under Fed. R. Evid. 902(3) because they are not certified by a diplomatic or consular official, and Mr. Leiva did not authenticate the documents himself. Tr. 161:10-19, 171:19-21.

16

b.  Mr. Leiva does not fall under any of the categories in 8 U.S.C. § 1101(f) that would preclude him from being found as a person of good moral character.

90.  In light of the Court's finding above that Mr. Leiva has satisfied his burden of establishing that he was married only one time, and that was to Ms. Davis, it rejects the Government's argument that he lied during his naturalization interview.  Mr. Leiva's statement that he was only married once, see Tr. 54:11-15, is not a false statement.

91.  The Court also finds that Mr. Leiva did not give false testimony about his reasons for emigrating from Guatemala.

a.  At his deposition, Mr. Leiva stated that the only reason he "[came] to the United States" was to find "a good job."  Tr. 232:23-25.  The Government incorrectly contends that this is inconsistent with his trial testimony that he left Guatemala for fear of persecution.  Tr. 156:9-12.  These statements are not inconsistent.  As he explained at trial, he left Guatemala because of the turmoil, but chose to come to the United States over other nations because his job prospects were better here than elsewhere.  Tr. 156:9-22.  His testimony on this point was credible and his explanation makes sense.

b.  Moreover, even if his statement was inconsistent, it does not disqualify him from naturalization.   There is no evidence that he made the statement at his deposition for the purpose of obtaining immigration benefits.  No possible benefit could flow from it.  If anything, his chance of naturalization could only be harmed by stating that Guatemala was safe when it was not because it conceals his compelling personal story. It is far more likely that any inconsistency is attributable to Mr. Leiva's language

issues than a subjective intent to impact his naturalization proceedings.  The Court therefore finds that this issue does not indicate bad moral character.

92. The Court finds that Mr. Leiva did not demonstrate bad moral character when he testified about the circumstances surrounding his arrest.

   a. Mr. Leiva did not give false testimony when he testified at trial that the children were only in his house for a few seconds, instead of five minutes.

   b. Assuming Mr. Leiva's statement was inconsistent, there is no evidence that he said it with the requisite subjective intent.  Not every inconsistency during testimony is grounds for finding the person seeking naturalization lacks good moral character; only false testimony given for the "precise intent" of obtaining immigration benefits is prohibited.  Kungys, 485 U.S. at 780.  There are three reasons why such intent is missing here.  First, the difference is insubstantial—the sort of innocent mistake in recollection that a person testifying about events that occurred years earlier would likely make.  In this case, Mr. Leiva was asked in 2016 about circumstances that occurred sixteen years earlier.  "Human memory is selective as well as fallible, and the mistakes that witnesses make in all innocence must be distinguished from slips that . . . show that the witness is a liar."  Kadia v. Gonzales, 501 F.3d 817, 822 (7th Cir. 2007).

   c. Second, based on the Court's observation of Mr. Leiva at the hearing, Mr. Leiva appeared to lack any appreciation of the difference between minutes and seconds as it relates to his immigration status.  This is consistent with Mr. Leiva's educational background and intellectual capacity.  Although he can read, write, and speak English, he has difficulty communicating and has minimal formal education.   There is no

indication that Mr. Leiva believed he could help his naturalization chances if he answered in terms of seconds rather than minutes.

d. Third, there is little reason for him to intentionally lie about this issue in light of his other disclosures. Throughout the administrative and judicial processes, Mr. Leiva has been forthright about his arrest. He disclosed the incident in his N-400, and he admitted during trial that a child entered his house and viewed the video. He accordingly disclosed all facts that make up the substance of the charge. See Plea. Tr. 17:11-13. Mr. Leiva discussed these far more consequential issues with candor. The Court is not persuaded that Mr. Leiva nonetheless gave false testimony at his deposition or at trial by speaking of the incident in terms of seconds instead of minutes. The Court therefore finds that Mr. Leiva has met his burden of demonstrating good moral character despite this inconsistency.

93. The Court also does not find bad moral character based on Mr. Leiva's alleged failure to comply with Megan's Law.

a. Mr. Leiva has provided evidence that he participated in all Megan's Law requirements, as detailed by the state court judge. He provided uncontroverted testimony that he participated in the DNA test, provided his address to his parole officer, and otherwise successfully completed his supervision. To corroborate his participation, the final Judgment of Conviction no longer mentioned any Megan's Law requirements. The fact that Mr. Leiva does not remember whether he actually registered does not render him a person of bad moral character, particularly in light of the evidence that he complied with the Law's requirements, as explained to him at the plea colloquy. His testimony was credible and consistent on this point, and the

Government offers no evidence to the contrary.  The Court does not find Mr. Leiva to be a person of bad moral character on this ground, either.

## C. English Literacy Test

94. Finally, the Court holds, under a de novo review, that Mr. Leiva passed the written English examination.[9]

95. USCIS publishes "Scoring Guidelines" that describe how the writing portion is scored. USCIS, *Scoring Guidelines for U.S. Naturalization Test* www.uscis.gov/sites/default/files/USCIS/Office%20of%20Citizenship/Citizenship%20R esource%20Center%20Site/Publications/PDFs/Test_Scoring_Guidelines.pdf (last visited Jan. 9, 2017).  The Guidelines provide:

    a.  Pass:

- Has the same general meaning as the dictated sentence

- May contain some grammatical, spelling, punctuation, or capitalization errors that do not interfere with meaning

- May omit short words that do not interfere with meaning

- Numbers may be spelled out or written as digits

    b.  Fail:

- Writes nothing or only one or two isolated words

---

[9] The Government incorrectly argues that the Court cannot review the merits of his exam. Congress provided that "review [of the denial of an application for naturalization] shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of [Mr. Leiva], conduct a hearing de novo on the application."  8 U.S.C. § 1421.  Therefore, the Court will conduct a de novo review of Mr. Leiva's proficiency in the English language.  See Poka v. I.N.S., No. 01-1378, 2002 WL 31121382, at *4 (D. Conn. Sept. 19, 2002) (holding that in light of the petitioner's testimony at trial, he had not demonstrated proficiency in the English language).

- Is completely illegible

- Writes a different sentence or words

- Written sentence does not communicate the meaning of the dictated sentence

- Writes an abbreviation for a dictated word

Scoring Guidelines at 2.

96. The Court holds that Mr. Leiva passed the English writing examination.

   a. As an initial matter, Officer One's testimony about the subjectivity of the grading standards was disquieting. He essentially applies his own test that has no basis in statute, regulation, or guideline. And his testimony conflicted with the Guidelines themselves. For example, he stated that "for me . . . all the words have to be included" for the answer to be deemed correct. Tr. 69:7-10. However, the Guidelines specifically state that an applicant "[m]ay omit short words that do not interfere with meaning" and still pass the examination. Scoring Guidelines at 2.

   b. The appeal process is equally troubling. First, the appeal of a denial of naturalization lacks a legitimate oversight mechanism. The appeals officers appear merely to be regular officers who nominally and temporarily assume an appellate role, and they discuss the case with the original adjudicator before rendering a decision. This system is more akin to a proof read than a legitimate appellate review process.

   c. Second, the officers' method of tracking the appeals process with check marks is arbitrary, susceptible to errors, and unaccountable, particularly because the appeals officer's familiarity with her co-worker's handwriting appears to be the only way this Court can determine whether a particular question was asked at the appeals interview.

d. As to Mr. Leiva's writing examination, the Court finds that Plaintiff's third answer—
"flag day is in Junio"—demonstrated sufficient proficiency in the English language.
The only provision of the Guidelines that this answer could arguably have violated was
that Mr. Leiva "wr[ote] a different sentence or words." However, the Guidelines use
"words" in the plural sense; Mr. Leiva only wrote one incorrect word. Moreover, Junio
is a cognate of June—the two words are virtually identical and Junio is readily
understood to mean "June." Mr. Leiva's answer was legible, communicated the
meaning of the dictated sentence, and demonstrated that he had the requisite English
language writing proficiency to be naturalized.[10]

## V. CONCLUSION

For the reasons set forth above, the Court concludes that Mr. Leiva proved by a
preponderance of the evidence that he meets all of the requirements for naturalization. The Court
grants Mr. Leiva a declaratory judgment that he has demonstrated a strong right to naturalization.

An appropriate Order accompanies this Opinion.

**Dated: January 20, 2017**                    /s/ *Madeline Cox Arleo*
                                               **Hon. Madeline Cox Arleo**
                                               **UNITED STATES DISTRICT JUDGE**

---

[10] When an applicant fails the English literacy examination, he or she is generally given a second
opportunity to take the exam. See 8 C.F.R. § 245a.17; 8 C.F.R. § 312.5(a); Tr. 104:21-24. Here,
Mr. Leiva was not given a second opportunity. See Tr. 59:12-24, 104:25-105:2. Officer One gave
no explanation for this, and his failure to do so further demonstrates the arbitrariness of the process.
However, because the Court concludes that Mr. Leiva demonstrated proficiency in written English,
it need not remand the case for USCIS to permit Mr. Leiva to again attempt the English writing
exam.